**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| Crate Holdings LLC d/b/a Crate Holdings Ammo, | ) ) | Case No.: 24-00312-eg |
| | ) | |
| Debtor. | ) | |

**NOTICE OF OBJECTION TO CLAIM AND MOTION FOR
DETERMINATION OF SECURED STATUS**

TO: E-ADVANCE, LLC

    Crate Holdings LLC d/b/a Crate Holdings Ammo ("Debtor") has filed an objection to your claim in this bankruptcy case.

**Your claim may be reduced, modified, or eliminated. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

    If you do not want the court to eliminate or change your claim, then within 30 days of service of this notice, you or your lawyer must:

    File with the court a written response to the objection, explaining your position, at:

      1100 Laurel Street
      Columbia, SC 29201

    Responses filed by an attorney must be electronically filed in ecf.scb.uscourts.gov.

    If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above.

    You must also send a copy to:

    Christine E. Brimm, Esq.
    Barton Brimm, PA
    P.O. Box 14805
    Myrtle Beach, SC 29587

Attend the hearing scheduled to be heard on **July 11, 2024 at 10:30 a.m.**, at the King and Queen Building, 145 King Street, Room 225, Charleston, SC 29401.

If no response is timely filed and served, no hearing will be held on this objection, except at the direction of the judge. If you or your attorney do not take these steps, the court may decide that you do not oppose the objection to your claim and may enter an order granting that relief prior to the scheduled hearing date, if determined to be appropriate.

BARTON BRIMM, PA

By: /s/ Christine E. Brimm
Christine E. Brimm, #6313
Attorney for the Debtor
P.O. Box 14805
Myrtle Beach, SC 29587
cbrimm@bartonbrimm.com
Tele: (803) 256-6582

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| Crate Holdings LLC d/b/a Crate Holdings Ammo, | ) ) | Case No.: 24-00312-eg |
| | ) | |
| Debtor. | ) | |

**OBJECTION TO PROOF OF CLAIM NO. 13
FILED BY E-ADVANCE, LLC;
AND MOTION FOR DETERMINATION OF SECURED STATUS
UNDER SECTION 506(A)**

Pursuant to 11 U.S.C. § 502(a) and Rule 3007 of the Federal Rules of Bankruptcy Procedure, the Debtor hereby objects to the claim of E-Advance, LLC ("MCA Lender") set forth in Proof of Claim No. 13 ("POC"). Further, pursuant to 11 U.S.C. § 506(a) and Rule 3012 of the Federal Rules of Bankruptcy Procedure, the Debtor hereby moves for determination of the amount of the alleged secured claim of MCA Lender. The Debtor seeks to disallow MCA Lender's POC in its entirety. In support thereof, the Debtor would show as follows:

1. The Debtor filed for relief under Chapter 11 of Title 11 on January 29, 2024.

2. MCA Lender was originally listed on Debtor's Schedule D[1] as a secured creditor, based on a South Carolina UCC filing and the fact that the Debtor was still investigating UCC filings in Delaware.

3. The Debtor was organized under the laws of Delaware.[2]

4. Upon determination that a UCC filing in Delaware was required to perfect a lien against the Debtor, and that MCA Lender did not file a UCC in Delaware, the Debtor amended its schedules and moved MCA Lender to Schedule F.[3]

5. MCA Lender was served with the amended schedules.[4]

6. Due to an oversight, the claim was not listed as disputed, but this has since been corrected.[5]

---

[1] ECF 1.
[2] *See* **Ex. A**, Delaware Division of Corporations listing for Crate Holdings LLC as Domestic Limited Liability Company in Delaware (incorporated herein by reference).
[3] ECF 48, filed February 29, 2024.
[4] ECF 49.
[5] ECF 86; served on MCA Lender as indicated at ECF 87.

3

7. On April 8, 2024, MCA Lender filed its POC.[6]

8. The POC asserts a claim amount of $41,825.00, and further asserts that the claim is secured by "Accounts/Purchased Receipts." The POC states that the basis for perfection is "UCC Financing Statement."

9. On the Petition Date, the Debtor's assets consisted primarily of inventory. Not only were there were no accounts receivable, but the Debtor did not own any payment rights on the Petition Date.[7]

10. The Agreement between the Debtor and MCA Lender ("MCA Agreement")[8] provides that the agreement shall be governed and construed in accordance with the laws of the state of New York.

## ARGUMENT

A. <u>MCA Lender Failed to Perfect its Security Interest and Does Not Have a Secured Claim</u>

Crate Holdings was organized under the laws of Delaware. MCA Lender filed a UCC in South Carolina, which does not perfect a security interest in a Delaware corporation. See § 9-307(e) (a registered organization that is organized under the law of a state **is located in that state**); § 9-301 (local law where debtor **is located** controls); § 9-501 (UCC to be filed in the office of the Secretary of State in the state where local law governs, i.e., where debtor **is located**). Since the Debtor was organized under the laws of Delaware, it is located in Delaware for purposes of the UCC. Thus, in order to perfect its lien against this Debtor, MCA Lender was required to file a UCC-1 Financing Statement in Delaware. It did not do so. Since the security interest of MCA Lender was not perfected, the claim is unsecured.

MCA Lender has asserted to the undersigned that no UCC-1 Financing Statement was required because the transaction consisted of the sale of payment rights. They cite § 9-309 for the proposition that a security interest in the sale of a payment intangible is perfected upon attachment. This argument fails for numerous reasons.

First, the transaction at issue was not a true sale, but instead was a disguised loan. This is discussed further *infra*. Second, assuming for the sake of argument only that the transaction was a true sale, then it was the sale of Accounts Receivable ("A/R"). A/R is excluded from the definition

---

[6] Claim 13-1.
[7] See Schedule A/B, ECF 1. Other than inventory, the Debtor had almost negligible cash on hand and in its bank accounts, and other assets with *de minimus* value such as office furniture and computers.
[8] The MCA Agreement is attached to the POC.

4

of a "payment intangible" as that term is used in § 9-309. *See* § 9-102(61) ("payment intangible" is a "general intangible" under which the account debtor's principal obligation is a monetary obligation); § 9-102(42) (definition of "general intangible" excludes "accounts"); § 9-102(2) ("accounts" means a right to payment of a monetary obligation for, *inter alia*, goods or services). Therefore, § 9-309 does not apply to the transaction at issue. Pursuant to § 9-310, a financing statement is required to perfect a security interest in A/R.

Third, the Debtor did not have any A/R at the time of the bankruptcy filing, and did not have any "payment intangibles." The Debtor's assets consisted primarily of inventory (which requires a financing statement to perfect), limited bank accounts (which require control to perfect), and some basic office equipment (again, requiring a financing statement). Any proceeds of the aforementioned would likewise require a financing statement. *See* § 9-315. The Debtor has nothing that would possibly secure payment to MCA Lender without a properly perfected financing statement.

MCA Lender failed to perfect its security interest. Even if it could be construed that § 9-309 applies to this MCA transaction, no payment intangible was in existence on the Petition Date that could have been perfected by attachment, and nothing was in fact attached.

Pursuant to 11 U.S.C. § 506(a), a claim is secured to the extent of the value of the creditor's collateral, and the remaining claim is unsecured (to the extent allowed). MCA Lender does not have any collateral, and therefore the value of its asserted secured claim is zero.

MCA Lender's POC should be disallowed to the extent that it asserts that any portion of its claim is secured. Further, MCA Lender's POC should be disallowed in its entirety as further set forth *infra*.

B.  The MCA Agreement is a Disguised Loan and Not a True Sale

Notwithstanding particular language in an MCA agreement to the contrary, courts have the ability to reclassify a purported "sale" as a disguised loan. *See Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797 (Bankr. Mont. 2021); *Nickey Gregory Co. v. Agricap, LLC*, 597 F.3d 591 (4th Cir. 2010). All MCA agreements purport to be a "sale" and specify that the transaction is "not a loan." However, the Court may (and should) overlook such language, and should analyze the nature of transaction as a whole. *See Shoot the Moon,* 635 B.R. 797; *GMI Grp., Inc. v. Unique Funding Solutions, LLC (In re GMI Grp., Inc.)*, 606 B.R. 467 (Bankr. N.D. Ga. 2019).

5

The MCA Agreement at issue states that New York law governs. "In assessing the substance of financial transactions, the Court of Appeals [in New York] has focused on how the contract at issue allocates risk between the parties." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F.Supp.3d 237, 247 (S.D.N.Y. 2022). As noted by the court in *Haymount*, with citation to numerous New York cases, the analysis does not hinge on the mechanical application of dispositive factors. Instead, the court should consider the transaction as a whole to determine whether there is a *real* transfer of risk. *Id*. at 247-48; see also *Shoot the Moon*, 635 B.R. at 813-14. Analyzing nearly identical contract terms as the MCA Agreement in the case at bar, the *Haymount* court found that "the MCA agreements at issue here have many features that weigh in favor of finding the transactions to be loans," and that the "features of the MCA agreements are more consistent with an 'intent to borrow' a fixed sum through a loan rather than an intent to purchase specified receivables of an independent business." *Haymount,* 609 F.Supp.3d at 249.

Considering a similar MCA transaction, another court in New York found that the MCA agreement was a disguised loan, and that language "purport[ing] to provide for the sale of accounts receivables [was] just window dressing." *Fleetwood Services, LLC v. Ram Capital Funding, LLC, et al*, 20-cv-5120 (LJL), 2022 WL 1998207 at *11 (June 6, 2022 SDNY). Likewise, the court in *Shoot the Moon* found that similar MCA transactions were loans. *Shoot the Moon*, 635 B.R. at 814-20. *See also Lateral Recovery LLC, et al. v. Queen Funding, LLC, et al.*, 21 Civ. 9607 (LGS), 2022 WL 2829913 (July 20, 2022 SDNY) (MCA agreements had hallmarks of a loan rather than true sale); *but see In re R&J Pizza Corp*., Case No.: 14-43066-CEC, 2014 WL 12973408 (Bankr. E.D. N.Y. Oct. 14, 2020) (concluding that sale of credit card receivables was a true sale, but failing to consider the nuances of the transaction as discussed in *Haymount*, *Shoot the Moon*, and *Fleetwood*). Notably, the New York Attorney General has characterized MCA transactions as a form of lending, as opposed to a sale. *See People v. Richmond Capital Grp.*, 2021 N.Y. Slip Op. 32367 (N.Y. Sup. Ct. 2021).

The MCA Agreement at issue effectively places the risk on the Debtor. It is a loan and not a true sale.

6

   C. <u>The MCA Agreement is a Void Usurious Loan</u>

The MCA Agreement is a loan with an effective interest rate of 221%.[9]

Pursuant to N.Y. Penal Law § 190.40, loans in excess of 25% annual interest are criminally usurious. Under New York law, a criminally usurious loan is void *ab initio*. N.Y. Gen. Oblig. Law. § 5-511; *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 179 N.E.3d 612 (N.Y. 2021); *Haymount*, 609 F.Supp.3d at 254 ("Where the interest rate exceeds the criminal usury rate, a corporation may interpose an affirmative defense of usury and, if successful, obtain a declaration that invalidates the debt instrument *ab initio*.").

The MCA Agreement is criminally usurious, and is void *ab initio*. Therefore, the POC of MCA Lender should be disallowed in its entirety.

## CONCLUSION

WHEREFORE, Debtor requests that the Court determine that MCA Lender does not have a secured claim and/or that any secured claim of MCA Lender shall be valued at zero; that no assets of the Debtor were attached by MCA Lender; that the MCA Agreement be declared a loan rather than a true sale; that MCA Lender's loan be declared void *ab initio*; that MCA Lender's POC be disallowed in its entirety; and for such other and further relief as is equitable.

RESPECTFULLY SUBMITTED on this the 4th day of June, 2024.

                                  BARTON BRIMM, PA

                                  By: /s/ Christine E. Brimm
                                  Christine E. Brimm, #6313
                                  Attorney for the Debtor
                                  P.O. Box 14805
                                  Myrtle Beach, SC 29587
                                  cbrimm@bartonbrimm.com
                                  Tele: (803) 256-6582

---

[9] *See* **Ex. B** and **Ex. C**. The amount loaned to the Debtor was $50,000 (minus origination fees of $3,205). The amount to be repaid was $74,950, at the <u>daily</u> rate of $625.00. With this repayment schedule, the full loan amount would be repaid in approximately 120 days ($625 x 120 = $75,000). In a period of merely 4 months, MCA Lender was to earn $25,000 interest on its $50,000 loan.

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: ) | CHAPTER 11 |
| ) | |
| Crate Holdings LLC d/b/a Crate Holdings ) | |
| Ammo, ) | Case No.: 24-00312-eg |
| ) | |
| Debtor. ) | |

**CERTIFICATE OF SERVICE**

I, Connie Fraser, hereby certify that on behalf of the Debtor, I served a copy of the **OBJECTION TO PROOF OF CLAIM NO. 13 FILED BY E-ADVANCE, LLC; AND MOTION FOR DETERMINATION OF SECURED STATUS UNDER SECTION 506(A), filed June 3, 2024,** on the Office of the United States Trustee via electronic filing, and on the parties listed below, via First Class Mail and/or electronic filing on June 3, 2024.

Crate Holdings LLC
481 Highway 9 E #B
Longs, SC  29568
*Via First Class Mail*

E-Advance, LLC
370 Lexington Ave., Suite 501
New York, NY 10017
*Via First Class Mail*

Shanna M. Kaminski
Kaminski Law PLLC
P.O. Box 247
Grass Lake, MI 49240
*Via First Class Mail*

J. Kershaw Spong, Esq.
Subchapter V Trustee
*Via CM/ECF*

                              BARTON BRIMM, PA

                              BY: /s/ Connie Fraser
                              P.O. Box 14805
                              Myrtle Beach, SC  29587

Delaware.gov | Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

[Allowable Characters]

**HOME**

### Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | 5145806 | Incorporation Date / Formation Date: | 2/17/2021 (mm/dd/yyyy) |
| Entity Name: | CRATE HOLDINGS LLC | | |
| Entity Kind: | Limited Liability Company | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | UNASSIGNED AGENT | | |
| Address: | | | |
| City: | | County: | |
| State: | NullValue | Postal Code: | 95050 |
| Phone: | | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like  ○ Status  ○ Status, Tax & History Information

[Submit]

[View Search Results]    [New Entity Search]

For help on a particular field click on the Field Tag to take you to the help area.

EXHIBIT B



home / financial / interest rate calculator

# Interest Rate Calculator





**Results**

| | |
|---|---|
| **Interest rate** | **221.404%** |
| Total of 4 monthly payments | $75,000.00 |
| Total interest paid | $25,000.00 |



### Related

APR Calculator   |   Interest Calculator   |   Compound Interest Calculator

## What is Interest Rate?

Interest rate is the amount charged by lenders to borrowers for the use of money, expressed as a percentage of the principal, or original amount borrowed; it can also be described alternatively as the cost to borrow money. For instance, an 8% interest rate for borrowing $100 a year will obligate a person to pay $108 at year-end. As can be seen in this brief example, the interest rate directly affects the total interest paid on any loan. Generally, borrowers want the lowest possible interest rates because it will cost less to borrow; conversely, lenders (or investors) seek high interest rates for larger profits. Interest rates are usually expressed annually, but rates can also be expressed as monthly, daily, or any other period.

Interest rates are involved in almost all formal lending and borrowing transactions. Examples of real-world applications of interest rates include mortgage rates, the charge on a person's outstanding debt on a credit card, business loans to fund capital projects, the growth of retirement funds, amortization of long-term assets, the discount offered by a supplier to a buyer for paying off an invoice earlier, and much, much more.

### Simple vs. Compound Interest

There are two methods for calculating interest. Simple interest is calculated as a percentage of

principal only, while compound interest is calculated as a percentage of the principal along with any accrued interest. As a result of this compounding behavior, interest earned by lenders subsequently earns interest over time. The more frequently interest compounds within a given time period, the more interest will be accrued. Most formal interest payment calculations today are compounded, including those for this calculator, and any following reference to the interest rate will refer to compound interest rather than simple interest unless otherwise specified. To do calculations or learn more about the differences between compounding frequencies, please visit the Compound Interest Calculator.

### Fixed vs. Variable Interest Rates

Fixed rates are rates that are set as a certain percentage for the life of the loan and will not change. Variable rates are interest rates that can fluctuate over time. The degree of variance is generally based on factors such as another interest rate, inflation, or a market index. There are different pros and cons to each, but the Interest Rate Calculator will only display the result as a fixed interest rate.

### APR

The interest rate for many types of loans is often advertised as an annual percentage rate, or APR. APRs are commonly used within the home or car-buying contexts and are slightly different from typical interest rates in that certain fees can be packaged into them. For instance, administrative fees that are usually due when buying new cars are typically rolled into the financing of the loan instead of paid upfront. APR is a more accurate representation than the interest rate when shopping and comparing similar competing. On the other hand, annual percentage yield (APY) is the interest rate that is earned at a financial institution, usually from a savings account or Certificate of Deposit (in the U.S.). For more information or to do calculations involving APR, please visit the APR Calculator.

## Uncontrollable Economic Factors that Affect Interest Rate

There are many factors that affect what interest rates people get on their mortgages and auto loans. Although these largely cannot be controlled, having knowledge of these factors may still be helpful.

### Economic Policy and Inflation

In most developed countries today, interest rates fluctuate mainly due to monetary policy set by central banks. The control of inflation is the major subject of monetary policies. Inflation is defined as the general increase in the price of goods and services and the fall in the purchasing power of money. It is closely related to interest rates on a macroeconomic level, and large-scale changes in either will have an effect on the other. In the U.S., the Federal Reserve can change the rate at most up to eight times a year during the Federal Open Market Committee meetings. In general, one of their main goals is to maintain steady inflation (several percentage points a year).

### Economic Activity

In an economy, as interest rates go down, more businesses and people are inclined to borrow money for business expansion and making expensive purchases such as homes or cars. This will create more jobs, push up salary levels, and boost consumer confidence, and more money will be spent within that economy. On the other hand, if interest rates increase, consumer confidence goes down, and fewer people and businesses are inclined to borrow. Based on this, the central bank uses the interest rate as one of the main tools to control the economy. The central bank typically lowers the interest rate if the economy is slow and increases it if the economy expands too fast.

### Unemployment Rate

When the unemployment rate is high, consumers spend less money, and economic growth slows. However, when the unemployment rate is too low, it may lead to rampant inflation, a fast wage increase, and a high cost of doing business. As a result, interest rates and unemployment rates are normally inversely related; that is, when unemployment is high, interest rates are artificially lowered, usually in order to spur consumer spending. Conversely, when unemployment within an economy is low and there is a lot of consumer activity, interest rates will go up.

### Supply and Demand

Similar to the market for goods and services, the market for credit is determined by supply and demand, albeit to a lesser extent. When there exists a surplus of demand for money or credit, lenders react by raising interest rates. When there is less demand for credit or money, they lower rates in order to entice more borrowers. With that said, banks and credit unions still have to adhere to their reserve requirements, and there is a maximum amount that they can lend out at any time.

## Controllable Factors that Determine Interest Rate

While many factors that affect the interest rate are uncontrollable, individuals can, to some degree, affect the interest rates they receive.

### Individual Credit Standing

In the U.S., credit scores and credit reports exist to provide information about each borrower so that lenders can assess risk. A credit score is a number between 300 and 850 that represents a borrower's creditworthiness; the higher, the better. Good credit scores are built over time through timely payments, low credit utilization, and many other factors. Credit scores drop when payments are missed or late, credit utilization is high, total debt is high, and bankruptcies are involved. The average credit score in the U.S. is around 700.

The higher a borrower's credit score, the more favorable the interest rate they may receive. Anything higher than 750 is considered excellent and will receive the best interest rates. From the perspective of a lender, they are more hesitant to lend to borrowers with low credit scores and/or a history of bankruptcy and missed credit card payments than they would be to borrowers with clean histories of timely mortgage and auto payments. As a result, they will either reject the lending application or charge higher rates to protect themselves from the likelihood that higher-risk borrowers default. For example, a credit card issuer can raise the interest rate on an individual's credit card if they start missing many payments.

### How to Receive Better Interest Rates

Although individual credit standing is one of the most important determinants of the favorability of the interest rates borrowers receive, there are other considerations they can take note of.

- **Secured loans**—Generally speaking, unsecured loans will carry higher interest rates than secured loans, mainly because there is no collateral involved. That is, if the borrower defaults, the lender is legally entitled to ownership of the collateral. Borrowers seeking more favorable interest rates can consider putting up collateral for a secured loan instead.
- **Loan specifics**—Longer repayment terms can increase the interest rate because it is riskier for lenders. In addition, making too low a down payment (which is also seen as risky) can result in the borrower receiving a higher interest rate. Choosing a shorter loan term and putting more money down can lower the interest rate a borrower is subject to.
- **Do not apply for credit too often**—Too many inquiries on a credit report tell a lender that a borrower may have trouble attaining credit, which is a sign of a high-risk borrower. A single inquiry can deduct a few points off a credit score!
- **Borrow at opportune moments**—While borrowers have no control over economic factors,

they can choose to borrow during times when economic factors are more favorable. When the economy is slow and demand for loans is low, it is possible to find lower interest rates.

- **Research and shop around**—Different lenders have different rates. Borrowers may be able to find a lower interest rate by shopping around rather than accepting the first loan offered. It is possible to reveal to each lender that another is offering a better rate as a negotiation tactic. While getting a good rate is important, be careful about specific conditions and any additional costs.

## Real Interest Rate

The relationship between real interest rate, inflation, and the nominal rate is shown by the following equation:

$$\text{real rate} + \text{inflation} = \text{nominal rate}$$

In this equation, the nominal rate is generally the figure being discussed when the "interest rate" is mentioned. The nominal rate is the sum of the general level of inflation and the real rate of interest that is being applied. For more information about or to do calculations involving inflation, please visit the Inflation Calculator.

Search

### Financial Calculators

| | |
|---|---|
| Mortgage | Loan |
| Auto Loan | Interest |
| Payment | Retirement |
| Amortization | Investment |
| Currency | Inflation |
| Finance | Mortgage Payoff |
| Income Tax | Compound Interest |
| Salary | 401K |
| Interest Rate | Sales Tax |

More Financial Calculators

Financial | Fitness and Health | Math | Other

about us | sitemap | terms of use | privacy policy  © 2008 - 2024 calculator.net

EXHIBIT C

**Fidelity Bank**

---

# CALCULATORS

## PERSONAL FINANCIAL CALCULATOR

12/3/2018

/calculator-what-is-my-loan-rate/

MPUTE%26CALCULATORID%3DPC07%26TEMPLATE_ID%3Dwww.fidelitybank.com_4%26PostBack%3Dtrue)

### What is my loan rate?

This loan rate calculator will calculate the interest rate on a loan given a loan amount, payment amount, and number of payments.

All fields are required.

| | |
|---|---|
| **Purchase price** | $50,000.00 |
| **Down payment amount** | $0.00 |
| **Payment amount** | $18,750.00 |
| **Loan term** | 4 |

**Term in months or years**

◉ Months  ◯ Years

☐ Show payment schedule

[ COMPUTE ]

### Calculator Results

Your loan rate is 221.406 %.

Calculator tips

Your payments add up to $74,999.99 which includes your payments to interest which add up to $24,999.99 over the life of the loan.

This calculator uses monthly compounding and monthly payment frequency.

Calculator disclaimer

The information provided by these calculators is intended for illustrative purposes only and is not intended to purport actual user-defined parameters. The default figures shown are hypothetical and may not be applicable to your individual situation. Be sure to consult a financial professional prior to relying on the results.

Presented by TimeValue Software ©2024

## CUSTOMER SERVICE

## ROUTING #301171353

Member FDIC, Equal Housing Lender © 2024 Fidelity Bank, N.A. | Oklahoma Fidelity Bank. All rights reserved. NMLS #419266